[No. 19373-6-II.   Division Two.   October 4, 1996.]

THE STATE OF WASHINGTON, *Respondent*, v. HENRY LEE MARSHALL, *Defendant*, DINO G. SEPE, ET AL., *Appellants*.

*Monte E. Hester, Wayne C. Fricke*, and *Law Offices of Monte E. Hester, Inc., P.S.,* for appellants.

*John W. Ladenburg, Prosecuting Attorney*, and *Barbara L. Corey-Boulet, Deputy*, for respondent.

TURNER, J. — Criminal defense attorneys Larry W. Nichols and Dino G. Sepe appeal a Pierce County Superior Court order holding them in contempt for refusing to testify about communications with their former client, convicted murderer Henry L. Marshall. Without determining whether the communications were privileged, we hold that the trial court's order compelling testimony was premature. We therefore, vacate the contempt order.

Marshall was charged with first degree aggravated murder in Pierce County Superior Court. Nichols and Sepe were appointed as co-counsel to represent him.

In July 1994, the superior court signed a stipulated order extending for 60 days the statutory period for filing a Notice to Seek Death Penalty.[1] Deputy Prosecutor Gerald Horne prepared and presented the order, which was also

---

[1]RCW 10.95.040, the statute requiring a Notice of Special Sentencing Proceeding to determine whether the death penalty should be imposed, provides:

(1) If a person is charged with aggravated first degree murder . . ., the prosecuting attorney shall file written notice of a special sentencing proceeding to determine whether or not the death penalty should be imposed when there is reason to believe that there are not sufficient mitigating circumstances to merit leniency.

(2) The notice of special sentencing proceeding shall be filed and served on the defendant or the defendant's attorney within thirty days after the defendant's arraignment upon the charge . . . unless the court, for good cause shown, extends or reopens the period for filing and service of the notice. . . .

(3) If a notice of special sentencing proceeding is not filed and served as provided in this section, the prosecuting attorney may not request the death penalty.

signed and approved by Sepe.[2] Horne presented a second similar stipulated order, which was signed and approved by Nichols, and which the court entered in September 1994. It extended the notice period to November 14, 1994. Marshall was not present in court when these extension orders were presented. The record does not show why he was absent, or whether he knew about or agreed to these extensions.

On October 28, 1994, Marshall wrote to the court saying he wished to plead guilty. The letter was written without his lawyers' knowledge or approval. On November 2, 1994, with his lawyers present but against their advice, Marshall pleaded guilty to Aggravated Murder in the First Degree.[3] Marshall told the court that he knowingly and

---

[2]According to Pierce County Prosecutor John Ladenburg, it is common "to the point of routine" that attorneys for defendants charged with aggravated murder request extensions of the time period for filing a death penalty notice so that they might prepare a "mitigation package" to be used by the Prosecutor in determining whether or not to seek the penalty. "[The Prosecutor's Office] has always agreed to such a request when it does not cause a shortage of preparation time in relation to the trial date."

[3]The Court specifically called his attention to paragraph 7(e) on the guilty plea form:

COURT: [T]here is a paragraph that says . . . basically that you understand that the prosecuting attorney will make the following recommendations to the Judge, and that's blank.

[MARSHALL]: Yes, I'm aware of that.

COURT: Do you understand the reason why that is blank?

[MARSHALL]: The reason that it is blank is because they [the State] haven't decided what they're going to do yet.

COURT: That's right. They may in fact decide to seek the death penalty in this case.

[MARSHALL]: I'm aware of that.

The Court then questioned Marshall about his relationship with counsel, and the adequacy of his representation:

COURT: Mr. Marshall, have your attorneys emphatically advised you not to do this?

[MARSHALL]: Oh, yes.

voluntarily wished to plead guilty, even though he knew the plea could subject him to the death penalty.[4]

On November 14, 1994, the State filed a Notice to Seek Death Penalty.[5] The court set the required hearing for February 1995.

In January 1995 Sepe and Nichols moved to withdraw as counsel for Marshall "on the grounds that under the Rules of Professional Conduct (RPC) 1.15(b)(3) the defendant insists upon pursuing an objective that the lawyers consider repugnant or imprudent."[6] The court permitted

---

. . . .

COURT: . . . From the record that's been made here today, and from the prior proceedings that we've had, I assume you feel your attorneys have adequately represented you in this matter.

[MARSHALL]: Oh, yeah. Yes.

COURT: Do you have any doubt about that in your mind whatsoever?

[MARSHALL]: No.

[4]A later discussion took place regarding a sentencing date. Prosecutor John Ladenburg stated:

[A]s the Court knows, the date for making a decision on the request for death penalty has been postponed to the 14th to allow defense counsel more time to prepare a mitigation package. When that arrives, we intend to make that decision on the 14th and immediately notify the defendant and the Court and the victims' families of our decision.

At that point, then, I think we need to probably schedule a time to come back into court within the next day or so to either schedule a sentencing hearing or a[ ]sentencing proceeding.

To this, Attorney Nichols replied, "No objection," and Attorney Sepe responded, "That's appropriate, Your Honor."

[5]*See* RCW 10.95.040(2), note 1, *supra.*

[6]In their supporting affidavit, they stated, inter alia,

[At the November 2, 1994 hearing where Marshall entered his guilty plea], we both made clear statements to the court that we did not agree with that course of action, . . . that we repeatedly tried to talk Mr. Marshall out of pleading guilty, especially because the Prosecuting Attorney had not made a decision concerning the death penalty. We also realized that Mr. Marshall was going to proceed with his plea regardless of our advice. We discussed withdrawing as attorneys of record at that time but chose not to do so primarily because Mr. Marshall was still willing to allow us to present a mitigation package to the Prosecuting Attorney and to present mitigating evidence to a · jury at a penalty phase procedure.

Sepe and Nichols to withdraw, and appointed Judith Mandel and Ronald Ness as substitute counsel.

Mandel and Ness moved to dismiss the Death Penalty Notice. They contended that the 30-day period for filing the notice under RCW 10.95.040(2) was improperly extended, due to the trial court's "[failure to] provide the defendant himself with the opportunity to appear in open court and indicate on the record whether or not he concurred on either occasion where time was extended."

Marshall's new counsel argued that the criminal rules and the constitution required Marshall's presence in open court so the judge could conduct a colloquy with him to determine if the waiver or extension was voluntary. But they were not arguing ineffective assistance of Marshall's former counsel:

> [I]t's not a question of ineffective assistance of counsel. It's a question of structural defect in the procedure, a procedure that apparently is employed in Pierce County that doesn't accord with the law."

Report of Proceedings (March 20, 1995), at 5.

The State responded that the Death Penalty Notice statute is silent on whether extensions of time must be made in open court, with the defendant present. The State also contended that the defense was putting the prior attorneys' authority at issue:

. . . .

. . .From mid-December to the present time, Mr. Marshall has repeatedly . . . told us that he does not want us to contest, in any way, the sentencing phase or allow us to present mitigating evidence.

. . . .

. . .What we are being asked to do by our client is the medical equivalent of assisted suicide. Our moral beliefs make it impossible to represent Mr. Marshall if he persists in this course of action.

We have always opposed capital punishment, believe it to be morally cruel and barbaric . . . . Our strong moral beliefs against the death penalty and moral duty to preserve life have made it such that we cannot and will not proceed with Mr. Marshall's request to present no mitigating evidence in the sentencing phase.

[B]y making this motion, the defense not only has challenged whatever procedure was used, but they specifically have challenged the authority of the defense attorneys to act on their client's behalf in this respect and implicitly said that the attorneys acted without authority. The Court is entitled and in fact required to make a record that will allow the Court to decide, did they act with authority or without authority.

Report of Proceedings (March 20, 1995), at 6-7.

After discussing whether Nichols and Sepe should be forced to disclose their communications with Marshall, the court ordered them to testify[7] about any discussion they had with Marshall about their authority to extend the filing period:

Looking at just the narrow issue of having his prior attorneys testify, it seems to me that issue is somewhat narrower than whether he has to be present. The question is, was there a knowing waiver by Mr. Marshall allowing his attorneys to enter this order without his presence? I don't see how we can determine that without having them indicate whether it was discussed and whether he agreed to the procedure, and so forth and so on.

Report of Proceedings (March 20, 1995), at 6-7.

Sepe and Nichols refused to testify because "it would contravene the attorney-client privilege and their client had not given permission to give testimony."[8] The court held them in contempt, finding that by challenging the entry of the extension orders, Marshall was implicitly attacking their competency and integrity and, therefore, the

---

[7]The order compelling testimony directed Sepe and Nichols to testify

on the issue of the seeking and obtaining of extensions of the period to file the notice to seek death penalty (RCW 10.95.040) and on the issue of whether the defendant was aware of the intention to seek extensions and whether the defendant agreed with this action on the part of his previous attorneys.

[8]Following Sepe and Nichols's refusal to testify, the court found that their former client Marshall was refusing to waive his attorney/client privilege. When his present counsel, Ms. Mandel, reiterated that Marshall would make no waiver, the Court asked: "That's correct, Mr. Marshall?" He responded: "Yes, sir."

attorney-client privilege did not apply.[9] The court ordered Sepe and Nichols held in jail until they agreed to testify, but stayed execution of the order pending appellate review. This court granted accelerated review under RAP 18.12.

On appeal, we are not asked to decide, and we do not decide, whether a criminal defendant must be present in court when an order extending time for filing a death penalty notice is presented. Rather, the question before us is: When a criminal defendant's lawyer agrees to orders extending the time for filing a death penalty notice, but the defendant later challenges the validity of those orders, alleging that he had the right to be present in court, may the trial court hold counsel in contempt for asserting the attorney-client privilege when asked to testify about confidential attorney-client communications related to the extensions?

■ One of the underpinnings of our legal system is that a client be able to talk freely to his or her lawyer in strict confidence:

> Both the fiduciary relationship existing between lawyer and client and the proper functioning of the legal system require the preservation by the lawyer of confidences and secrets of one who has employed or sought to employ him. A client must feel free to discuss whatever he wishes with his lawyer and a lawyer must be equally free to obtain information beyond that volunteered by his client. A lawyer should be fully informed of all the facts of the matter he is handling in order for his client to obtain the full advantage of our legal system. . . . The observance of the ethical obligation of a lawyer to hold inviolate the confidences and secrets of his cli-

---

[9]The trial court's finding of fact 3 said:

"[T]he attorney-client privilege does not apply in this situation, since by challenging the action of the court in signing the extensions and the action of the attorneys in agreeing to the entry of such Orders Extending, the defendant has implicitly attacked the competency and integrity of his previous counsel and there is no other practical or logical method of ascertaining the facts in this situation."

ent not only facilitates the full development of facts essential to proper representation of the client but also encourages laymen to seek early legal assistance.

*Doe v. A Corp.* 330 F. Supp. 1352, 1354-55 (S.D. N.Y, 1971), *aff'd*, 453 F.2d 1375 (1972) (quoting American Bar Association Ethical Canon 4-1, MODEL CODE OF PROFESSIONAL RESPONSIBILITY (1985)).

██ Nichols and Sepe believed the communications were privileged. And their former client refused to waive the privilege.[10] But, the trial court found as a matter of law that "the attorney-client privilege[11] does not apply in this situation . . . ." In our view this was improper. Marshall's motion to dismiss the death penalty notice did not attack the authority of his former lawyers to act on his behalf. Rather, it claimed that Marshall should have been present in court to say whether he knowingly and voluntarily relinquished his right to timely notice. That issue was purely legal, and did not require inquiry into attorney-

[10]The attorney-client privilege has been interpreted as not absolute; the client as holder of the privilege can waive it. *State v. Pam*, 31 Wn. App. 692, 694, 644 P.2d 722 (1982) (citing *State ex. rel Sowers v. Olwell*, 64 Wn.2d 828, 833, 394 P.2d 681 (1964)), *rev'd on other grounds*, 101 Wn.2d 507 (1984). There is no authority, however, for an attorney to waive the privilege unilaterally on behalf of a client. Wash. State Bar Assoc., Code of Prof. Responsibility Comm., Formal Op. 175 (1982) (analyzing former Canon 4 and Disciplinary Rule 4-101).

[11]RCW 5.60.060(2), "Privileged communications," provides:

An attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment.

RPC 1.6(a), "Confidentiality," provides:

A lawyer shall not reveal confidences or secrets relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in sections (b) and (c).

(b) A lawyer may reveal such confidences or secrets to the extent the lawyer reasonably believes necessary:

(1) To prevent the client from committing a crime; or

(2) . . . to respond to allegations in any proceeding concerning the lawyer's representation of the client, or pursuant to court order.

client communications.[12] In other words, the proper question before the trial court was "whether a defendant's presence is required at a hearing to extend the filing period for a notice to seek death penalty or can his presence be waived?" If a defendant's presence is required, then testimony from Marshall's former attorneys was not needed. If a defendant's presence can be waived, the court could properly presume that counsel acted with their client's authority; it would not need to inquire into attorney-client communications unless and until the defendant claimed counsel acted without his authority. The trial court was able to decide the legal question of whether Marshall's presence was required in court without delving into attorney-client communications. We hold that the trial court erred by finding Nichols and Sepe in contempt of court.

We reverse, and vacate the order of contempt.

MORGAN and ARMSTRONG, JJ., concur.

---

[12]ER 401 provides that "relevant evidence" is that which has any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. As Nichols and Sepe correctly point out, "[t]he relevant inquiry is directed at the court procedures, not communication between the attorneys and their client." The testimony the court sought was not relevant to the question of whether the defendant's presence was required.