94 P.3d 994 (2004)
STATE of Washington, Respondent,
v.
Roy E. WEBBE, Appellant.
No. 51733-3-I.
Court of Appeals of Washington, Division 1.
July 26, 2004.
*995 Harlan R. Dorfman, David B. Koch, Nielsen Broman & Koch, Seattle, WA, for Appellant.
Lee D. Yates, King County Prosecutor's Office, Seattle, WA, for Respondent.
ELLINGTON, A.C.J.
In this unusual case, defense attorneys waived attorney-client privilege in competency proceedings, without their client's consent. *996 We hold that under the circumstances, this grievous error did not result in a breakdown in the adversarial process such that prejudice should be presumed. Webbe does not allege prejudice, nor do we discern any. We therefore affirm.

FACTS
In April, 2000, Deborah Funk was murdered in her apartment. She died as a result of deep stab wounds made by a kitchen knife, severing her carotid artery and spinal cord. Funk had also been raped. The same night, Jeanne Anderson, who lived near Funk, saw a man outside her apartment walking back and forth talking to himself. Shortly afterward, he came into her apartment and tried to choke her. Anderson's adult daughter, Artanetta Gray, saw the struggle and started to scream. The man hit Gray in the mouth and chased her out of the apartment, then fled.
Anderson and Gray identified a resident of a nearby transient camp named Roy Webbe as the man who attacked them. Webbe's fingerprints were found in Funk's apartment and his DNA was found in her body. At about the time of Funk's death, a call had been made from Funk's cell phone to a drug dealer acquainted with Webbe. Webbe was charged with aggravated murder in the first degree, murder in the first degree with sexual motivation, and burglary in the first degree.
Webbe was found not competent to stand trial,[1] and was treated at Western State Hospital. After doctors there opined he was competent, Webbe demanded a jury trial on the question.[2] His attorneys, Mark Prothero and Robert Williams, conceded that Webbe understood the nature of the charges against him, but contended he was not capable of assisting them in his defense.[3] Just before jury selection, they advised the court that attorney Williams would testify as to his opinions about Webbe's competency. The events that followed are the subject of Webbe's appeal.
The possibility of Williams testifying had arisen some months earlier, and the court then suggested the appointment of a guardian ad litem for Webbe on the issue of his ability to waive attorney-client privilege. Defense counsel objected, fearing a guardian ad litem would "create a barrier"[4] between them and Webbe, whose mental status was fragile.
When the question arose again during jury selection, the court expressed concern and stated: "It is difficult for me to imagine what Mr. Williams could testify [to] that would not open up the door to attorney-client privilege.... I don't know how there could be any cross-examination if ... that were not construed ... as a waiver of attorney-client privilege."[5] The judge recessed proceedings to "give the defense a chance to figure out whether they want to do this or not."[6]
After the recess, the defense made an offer of proof. Under examination by Prothero, Williams stated that in his opinion, Webbe was incapable of assisting in his defense, in part because Webbe's statements about the facts tended to change:
[W]e are still having problems ... eliciting from him the nature of his defense on a consistent basis....[I]f he changes it from a week-to-week or month-to month basis, it adds to a lot of confusion and it's very hard to defend someone who has a hard time saying what he thinks he did as opposed to what he did.[7]
Williams gave no details about Webbe's statements to him about the case. He testified he remained concerned about Webbe's mental stability even after the treatment at Western State, that Webbe had paranoid delusions, and that at the time of their last *997 meeting, Webbe was experiencing visual and auditory hallucinations.
Prosecutors indicated that Williams' proposed testimony amounted to an "overall encompassing opinion"[8] and that to prepare their cross-examination of Williams, they would have to interview him about his interactions with Webbe. Webbe's attorneys objected to any cross-examination of Williams. The court ruled that Williams would be permitted to testify, the State would be permitted to cross-examine, and that the State could interview Williams, but could not ask for details of Webbe's statements about the crimes.
Prosecutors asked for a redacted copy of Williams' interview notes to prepare their questions for him, and the defense agreed to provide them. After an extended colloquy on other subjects, the court returned to the issue of Williams' testimony, asking whether the defense had decided what to do. Mr. Prothero responded that Mr. Williams would testify. As trial proceeded thereafter, Mr. Williams was present, but took no active role.
Mr. Williams provided the court with redacted and unredacted copies of his notes, stating that if the court found the redaction unacceptable, he would reconsider whether to testify. After reviewing the notes in camera overnight, the judge ruled that although she had hoped "to be able to protect the core of the attorney/client privilege,"[9] the redaction was a failure, and it would be unfair not to provide the unredacted notes to the State. The court ruled that if the defense still planned to call Williams as a witness, Williams' original notes must be disclosed. The court gave the defense several hours to decide.
Mr. Prothero objected, arguing that the court's ruling "puts the defense in the Hobson's choice of deciding between calling a witness and impacting on the Sixth Amendment right to counsel[,]... between ... waiving [the Sixth Amendment right] ... versus the defendant's right to call witnesses in his behalf."[10] But after the recess, the defense chose to provide Williams' notes, unredacted, to the State.
The court ordered prosecutors not to disclose the contents of the notes to anyone, including detectives and investigators.
The next morning, the defense attorneys requested a chambers conference. They raised concerns about whether Webbe had consented to waive his attorney-client privilege. They expressed the view that the court's ruling had put them "in a position of violating the rules of professional conduct."[11]
The court immediately ordered the prosecutors to return Williams' notes, and reiterated her admonition that they were not to discuss the contents with anyone. Prosecutors confirmed they had not discussed the notes nor allowed anyone to see them, and would immediately return them. The court then appointed criminal defense attorney Robert Goldsmith as Webbe's limited guardian ad litem, to determine whether Webbe should waive his privilege for purposes of the competency proceeding.[12]
At a subsequent chambers conference with defense counsel and Webbe present, Goldsmith stated his belief that Webbe was marginally competent to understand the privilege issue, and that both he and Webbe believed it would not be in Webbe's best interests for Webbe to waive his privilege. Goldsmith also suggested that the prosecutors who had seen Williams' notes be recused.
The court reconvened in open session, and informed prosecutors of Goldsmith's conclusion about waiver and his recommendation that the prosecutors be disqualified. The judge stated that if the prosecutors were recused, she also should be recused, but that she would leave it for Webbe's defense counsel to make the appropriate motion.
No such motion was made, then or later. The prosecutors made a record regarding the issue, stating that defense counsel had discussed *998 the matter with them and appeared to be satisfied with their continued willingness to adhere to the court's ruling and "treat it as if we had never had those materials."[13] Trial proceeded; Williams did not testify.
The first competency trial resulted in a mistrial. A second jury found Webbe competent.
Webbe was then tried on the criminal charges. He testified, admitting that he had been in Funk's and Anderson's apartments on the night the crimes were committed, but denying his guilt. The jury convicted him on all charges. The two murder charges were merged, and Webbe was sentenced to life without parole.

DISCUSSION
The issues on appeal revolve solely around the consequences of Webbe's attorney's attempt to testify in the competency proceedings. Webbe contends disclosure of Williams' notes breached attorney-client privilege and violated his Sixth Amendment rights. He complains that the prosecutors violated his privilege, that the court failed to protect it, and that his own counsel were ineffective in making an unauthorized waiver and then failing to disqualify the prosecutors afterwards.
Waiver of Attorney-Client Privilege: Prosecutors and the Court. A party's offer of his attorney's testimony as to a part of any communication to the attorney constitutes a waiver of the privilege "`as to the whole of that communication.'"[14] But an attorney may not be examined without the consent of the client: "An attorney or counselor shall not, without the consent of his or her client, be examined as to any communication made by the client to him or her, or his or her advice given thereon in the course of professional employment."[15]
As Webbe forcefully points out, only he can waive his privilege; an attorney may not unilaterally waive privilege on behalf of a client.[16] It is undisputed that Webbe did not waive his privilege, and that his attorneys did not have authority to do so on his behalf.
Webbe's first complaint on appeal, however, is that prosecutors violated his privilege, when "they convinced the judge to order a disclosure of those conversations that neither the court nor Webbe's attorneys were authorized to make."[17] Webbe argues that "the prosecutors had no right to violate the attorney  client privilege as a matter of *999 simple discovery."[18] The essence of Webbe's argument is that the State should have obtained his waiver of privilege before seeing the notes. Webbe further contends the court erred by ordering disclosure of the notes without first establishing that Webbe had waived his privilege. Webbe points out that he was not present at some of the hearings where Williams' testimony was discussed. While he assigns no error to this approach,[19] he suggests his absence heightened the responsibility of the court and prosecutors to ensure that he had waived privilege.
This puts the shoe on the wrong foot. Ensuring that Webbe consented to their strategy was the responsibility of his counsel, not the prosecutors or the court. RPC 1.6(a) states: "A lawyer shall not reveal confidences or secrets relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation." In the days leading up to the disclosure, the court repeatedly warned defense counsel that their proposed course of action would result in a waiver of privilege, and gave them opportunities to evaluate the consequences of their proposal. The premise for the decision to call Williams to testify was clearly set down by the court: waiver would result. Even after the ruling that Williams could not testify unless he disclosed his unredacted notes, counsel chose to proceed.
Counsel thus surrendered Webbe's privilege by embarking upon a course of action requiring waiver, without ensuring their client agreed with their strategy. This was outside their authority. But Webbe's complaint about the conduct of the prosecutors is misplaced. Prosecutors were not in a position to ask questions of Webbe. Given the clear premise that the defense strategy would result in waiver, prosecutors surely assumed counsel had obtained a valid waiver from their client.
The court presented Webbe's attorneys with a clear choice, and with time to confer and reflect. They repeatedly chose the route that required waiver. Under the circumstances, it is not surprising that the court also assumed that defense counsel had their client's consent.
As this case demonstrates, it will often be preferable for the court to ensure, on the record, that its assumptions are reliable. Here, it would have been well for the court to have inquired of counsel, or perhaps (given the question of Webbe's competency to waive) to have appointed a guardian ad litem, regardless of counsel's objections.[20] (Webbe does not assign error to the court's failure to appoint a guardian ad litem.[21]) In the final analysis, however, the direct responsibility for assuring that Webbe had consented to their strategy and agreed to waive privilege was that of his own counsel. It was not error for the court to assume counsel had satisfied that obligation.
Neither the court nor the prosecutors erred in the events that resulted in unauthorized waiver of Webbe's attorney-client privilege.
Violation of Privilege: Ineffective Assistance of Counsel. Webbe next contends his counsel were ineffective, when they violated his privilege and then failed to demand removal of the prosecutors from the case. He expressly declines to argue that prejudice resulted. Instead, he contends that the circumstances *1000 amounted to a breakdown of the adversarial process sufficient to justify a presumption of prejudice under United States v. Cronic.[22]
The right to effective assistance of counsel is recognized not for its own sake, but for the effect it has on the ability of the accused to receive a fair trial. The Sixth Amendment requires counsel to act in the role of advocate:
The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted  even if defense counsel may have made demonstrable errors  the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.[23]
Ordinarily, the burden rests on the accused to show that his attorney's inadequacy caused him prejudice.[24] On rare occasions, however, failures of counsel make the process itself presumptively unreliable, and in such cases, no specific showing of prejudice is required.
A presumption of prejudice arises when the process loses its character as a confrontation between adversaries.[25] The examples enumerated by the court in Cronic included cases where counsel was totally absent, was prevented from assisting the defendant during a critical phase, or "entirely fail[ed] to subject the prosecution's case to meaningful adversarial testing."[26] For errors of judgment or strategy in an adversarial process, however, prejudice must be shown: "Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt."[27]
Circumstances of sufficient magnitude to create a presumption of prejudice have been found where there is no real likelihood that counsel could provide effective assistance, as when "all members of the bar" were appointed to represent defendants in a capital case six days before trial;[28] where counsel actively represented conflicting interests;[29] where the defense attorney abandoned his duty to his client and joined the State's efforts to prosecute, or counsel's own interests or sympathies conflict with his client's interests;[30] or where counsel called his client racially offensive names and threatened to provide substandard performance if his client chose to go to trial.[31]
Unless counsel is absent altogether, or the state somehow interferes in the representation, the only challenge giving rise to a presumption of prejudice is one based upon a conflict of interest on the part of counsel. A conflict, including one deriving from sympathy with the government's position, is a breach of the most basic of duties: the duty of loyalty in the adversarial process.[32] Such a conflict is itself prejudice, and no additional showing is required. As the Tenth Circuit stated in Osborn:
[D]efendant can pursue an ineffectiveness claim in two ways. He can assert that *1001 the process was not adversarial because of affirmative state interference or a conflict of interest, and/or he can argue that his attorney was so inadequate that he was effectively denied the benefit of full adversarial testing of his guilt. When a defendant challenges the adequacy of counsel's performance, he must meet the Strickland reasonableness and prejudice requirements.... When an actual conflict of interest is demonstrated, prejudice is presumed because "counsel breaches the duty of loyalty."[33]
Webbe argues that his counsel betrayed their duty of loyalty, creating a conflict between their interests and his. He particularly relies upon Frazer, in which the court observed that where a defense attorney "`adopts and acts upon a belief that his client should be convicted,'" and effectively joins the State in its efforts, an obvious conflict of interest exists and results in a breakdown of the adversarial process.[34]
This case is not like Frazer. Webbe's attorneys' judgment may be faulted, but their loyalty cannot. They were, if anything, overzealous in their devotion to him. They did not make the unauthorized disclosure with any purpose of benefiting themselves or the State. They had no sympathy whatsoever with the State's position. Rather, they hoped to prevent a finding of competency and avoid trial on the merits, where the State had a very strong case. The record establishes that Webbe's attorneys were skilled, creative and persistent, and that they mounted a vigorous defense and subjected the State's case to every form of adversarial testing. At no time did they abandon their proper roles such that the process "[lost] its character as a confrontation between adversaries."[35] Their mistake in assuming Webbe would waive privilege, once they advised him their strategy required it, was indeed an error of judgment, but it was not a failure of loyalty.
Webbe calls our attention to cases finding a presumption of prejudice from the mere possibility of the State's access to privileged materials. But these cases involve purposeful, wrongful intrusion upon attorney-client privilege, and uniformly concern the deterrence of state misconduct.[36] As Tenth Circuit pointed out in Osborn, a presumption of prejudice arises where the process loses its adversarial integrity because of affirmative state interference.[37] Since the State's conduct here was not improper, these cases are not helpful in our analysis.
Webbe argues we should presume prejudice because it would be difficult to demonstrate whether Williams' notes provided any advantage to the State. This argument is unconvincing. Webbe cites no authority for the notion that the difficulty of establishing prejudice is relevant to whether such a showing is required at all. Further, we disagree with Webbe's premise. If the prosecutors had made use of the notes in any fashion, it would likely be evident from the record. The notes consist of nine pages[38] of handwriting, in somewhat cryptic outline form. They appear to have been taken during three conversations between Williams and Webbe. Most of the notes concern Webbe's personal history. Two pages reflect one discussion about the crimes. Those notes contain only one version of the events. Webbe's testimony at the criminal trial was consistent with the notes in almost every detail.[39] Nothing *1002 in the notes was mentioned by prosecutors at any time. Nor does the record suggest a question or theory or argument informed by the notes. Further, Webbe was conclusively identified by both eyewitnesses from the Anderson apartment, and his fingerprints and DNA were powerful evidence of his guilt in the rape and murder of Funk. Unless the jury believed Webbe's version of events, it was an extremely strong case for the State. Nothing in the notes would have helped the State cross-examine Webbe, and there is no indication of any reliance on the notes in the record of his testimony. Had the notes been of help to prosecutors, the record would likely show it. It does not.
Lastly, Webbe contends his attorneys were ineffective for failing to seek disqualification of the prosecutors, and that in combination with their original error in violating his privilege, this shows a breakdown of the adversarial process sufficient to justify a presumption of prejudice. But the defense was invited to move for the prosecutors' recusal, and after discussions with them, chose not to do so. This decision was neither irrational, nor evidence of a breakdown in the adversarial process. Whether to disqualify the prosecutors was a matter of trial judgment, to be evaluated in light of the contents of the notes, the anticipated evidence at trial, the personal characters of the prosecutors, and the calculus of other consequences that might follow. The fact that experienced defense counsel made no motion to disqualify the prosecutors is simply a powerful indication of the lack of any prejudice from disclosure of the notes.
Unless the adversarial process has failed, specific errors of counsel must be shown to have caused prejudice.[40] A violation of attorney-client privilege could easily be gravely prejudicial. But despite the nature of the error here, Webbe shows no prejudice, and our review of the record reveals none.
In sum, the events surrounding disclosure of Webbe's attorneys' notes during the competency proceeding, however unsettling, did not result in an unfair trial on the criminal charges.[41]
Affirmed.
WE CONCUR: SCHINDLER and BAKER, JJ.
NOTES
[1] Webbe's principal diagnosis was bipolar affective disorder with psychotic features.
[2] See RCW 10.77.090(4).
[3] See In re Fleming, 142 Wash.2d 853, 862, 16 P.3d 610 (2001).
[4] Report of Proceedings (RP) (July 18, July 22, July 23, 2002) at 670.
[5] RP (January 14, July 15, July 16, 2002) at 54.
[6] Id. at 55.
[7] Id. at 65.
[8] Id. at 67.
[9] RP (July 17, July 18, 2002) at 481.
[10] Id. at 482.
[11] Id. at 487.
[12] Goldsmith was subsequently redesignated "independent counsel."
[13] RP (November 7, November 13, 2002) at 612. The colloquy was as follows:

Prosecutor: [I]t came to light in court that there was a concern about the propriety of the prosecutors remaining on the case and then Mr. Prothero, I know, had inquired of the State at some point, I think toward the end of that first competency hearing, about that issue.
The State, just to put it on the record, as to what the State had told Mr. Prothero and Mr. Williams, was that, again, we disseminated those materials and that information to no one. It was our position that we would treat those materials as if they never existed or that we had never had that information, that we would not use our knowledge of those materials in any way for impeachment purposes, for further investigation, and that we would be happy to, if there needed to be something more than just the State's representation to that fact on the record, that we would certainly be happy to have either an oral or written order imposed upon us by the court indicating that we are not to use those materials in any way or that knowledge in any way for any purposes in this trial or for any purposes beyond this trial.
....
Mr. Prothero had inquired of us and seemed satisfied with our willingness to certainly adhere to what the court's ruling was and to treat it as if we had never had those materials in any way.
Prothero: Nothing to add, Your Honor.
Id. at 611-12.
[14] State v. Vandenberg, 19 Wash.App. 182, 186, 575 P.2d 254 (1978) (quoting Martin v. Shaen, 22 Wash.2d 505, 513, 156 P.2d 681 (1945)); see also Kammerer v. Western Gear Corp., 96 Wash.2d 416, 420, 635 P.2d 708 (1981) (stipulation that defendant's attorneys would be called as witnesses held a waiver of attorney-client privilege permitting discovery of privileged documents).
[15] RCW 5.60.060(2)(a).
[16] See Vandenberg, 19 Wash.App. at 186-87, 575 P.2d 254; State v. Marshall, 83 Wash.App. 741, 749, 923 P.2d 709 (1996).
[17] Brief of Appellant at 36-37.
[18] Id. at 32.
[19] Counsel and the court apparently sought to preserve Webbe's fragile mental health by conducting much of the pretrial procedural work in his absence, partly to limit his time in the King County jail. See RCW 10.77.090(6).
[20] See RCW 4.08.060. The court has inherent authority to appoint a guardian ad litem for a civil litigant, see In re Marriage of Blakely, 111 Wash.App. 351, 353, 44 P.3d 924 (2002), review denied, 148 Wash.2d 1003, 60 P.3d 1211 (2003), but competency to stand trial on criminal charges falls under the chapter governing the criminally insane, chapter 10.77 RCW. The court's eventual approach here  appointing a guardian ad litem who is an experienced criminal defense attorney, who therefore understands and can preserve privilege  seems to us appropriate.
[21] And any error in this regard was invited. See State v. Wakefield, 130 Wash.2d 464, 475, 925 P.2d 183 (1996) (invited error doctrine prevents party who requested ruling at trial from complaining about that ruling on appeal).
[22] 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).
[23] Cronic, 466 U.S. at 656-57, 104 S.Ct. 2039 (citations omitted).
[24] Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
[25] Cronic, 466 U.S. at 657, 104 S.Ct. 2039.
[26] Id. at 659, 104 S.Ct. 2039.
[27] Id. at 659 n. 26, 104 S.Ct. 2039. (citations omitted).
[28] Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932) (cited in Cronic, 466 U.S. at 660, 104 S.Ct. 2039).
[29] Cuyler v. Sullivan, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (cited in Cronic, 466 U.S. at 661 n. 28, 104 S.Ct. 2039).
[30] Osborn v. Shillinger, 861 F.2d 612, 629 (10th Cir.1988).
[31] Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994).
[32] Cuyler, 446 U.S. at 349-50, 100 S.Ct. 1708; Strickland, 466 U.S. at 692, 104 S.Ct. 2052.
[33] Osborn, 861 F.2d at 626 (citations omitted) (quoting Strickland, 466 U.S. at 692, 104 S.Ct. 2052).
[34] Frazer, 18 F.3d 778 (quoting Cronic, 466 U.S. at 666, 104 S.Ct. 2039).
[35] Cronic, 466 U.S. at 657, 104 S.Ct. 2039.
[36] See State v. Garza, 99 Wash.App. 291, 994 P.2d 868 (2000) (corrections officers seized and examined defendants' private communications with attorneys); State v. Cory, 62 Wash.2d 371, 382 P.2d 1019 (1963) (sheriff's officers eavesdropped on attorney-client conversations); State v. Granacki, 90 Wash.App. 598, 959 P.2d 667 (1998) (police detective witness read privileged notes left on defense table during trial).
[37] Osborn, 861 F.2d at 626.
[38] There are nine pages of redacted notes and eight pages of unredacted notes in our record.
[39] Webbe admitted he had been in both apartments. He said he had consensual sex with Funk after sharing drinks and drugs with her and another friend, and that he had attempted to burgle Anderson's apartment because he owed money for drugs.
[40] Cronic, 466 U.S. at 658, 104 S.Ct. 2039.
[41] Given our disposition, we do not address the State's argument on cross-appeal that under the principles set forth in State v. Pawlyk, 115 Wash.2d 457, 800 P.2d 338 (1990) and State v. Hamlet, 133 Wash.2d 314, 944 P.2d 1026 (1997) the decision to offer Williams as a witness resulted in an automatic waiver of privilege and rendered the attorney's notes of client communications fully discoverable.