IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

IN THE MATTER OF THE PERSONAL )
RESTRAINT OF                    )        No. 34017-1-III
                                )
CASMER JOSEPH VOLK.             )
                                )        UNPUBLISHED OPINION
                                )
                                )
                                )
                                )

FEARING, C.J. — After his conviction for rape of a child, petitioner Casmer Volk filed this personal restraint petition. The petition contends that Volk's trial attorney performed ineffectively by failing to adequately investigate the State's case, by neglecting to consult forensic and juvenile memory experts and by forsaking the presentation of important evidence. Volk asks this court to grant him a new trial. After reviewing the findings emanating from a reference hearing, we agree with Volk and grant a new trial.

FACTS

This prosecution arises from Casmer Volk's relationship with Larry Hart, a four-year-old at the time of the charged crime. Larry Hart and his parent's names are pseudonyms.

On April 28, 2011, Thomas and Sarah Hart left Larry in the care of their friend and daycare provider, Diedre Cleary, while the couple vacationed in Oregon. Cleary lived with her boyfriend, now husband, Casmer Volk.

On April 30, 2011, Diedre Cleary took young Larry Hart to the local hospital, where a physician prescribed an antibiotic to treat a recurring ear infection. Larry soon suffered diarrhea, a common side effect from the antibiotic. Rectal bleeding and anal irritation sometimes accompany severe diarrhea. On May 1, Casmer Volk, without the presence of another, cared for Larry for two hours.

When Thomas and Sarah Hart returned from vacation later on May 1, Casmer Volk and Diedre Cleary brought Larry home. The next morning, May 2, Larry cried to his mother Sarah and declaimed: "my butt hurts." *State v. Volk*, No. 30707-7-III, Report of Proceedings (RP) at 135-36. Sarah wondered if Larry ached from diaper rash. Upon inspection, the mother observed Larry's reddened and inflamed anus. Sarah applied petroleum jelly to her son's anus, but he protested. When Sarah asked Larry: "'[W]hat happened? Why does your butt hurt?'" Larry answered: "'Cas hurt me.'" RP at 138. "Cas" is a nickname for Casmer Volk. Sarah quizzed her son: "'how did [Cas] hurt you?'" Larry replied: "'he put macaroni, lots of cream up my butt and his pee pee in my butt.'" RP at 138.

Sarah Hart awaited to confront Casmer Volk with Larry's allegations until Volk's return of a borrowed car seat. On Volk's visit to the Hart residence, Larry stood near the

2

front door as Volk arrived. Larry commented to Volk: "'you hurt me.'" RP at 142. After Volk left the residence, Sarah arranged transportation for herself and Larry to the hospital.

On May 2, 2011, Registered Nurse and Sexual Assault Nursing Examiner Megan Day met Larry and Sarah Hart in an examination room. Nurse Day uttered: "'Hi, how are you doing today?'" Larry replied, "'My butt hurts. He—that guy named Cas he put macaroni in my butt and lots of cream and he put his pee pee in my butt and it hurts.'" RP at 174. Larry repeated this statement several times in response to Day's open-ended questions. Upon inspection, Nurse Day found blood in Larry's underwear and around his scrotum. Day observed redness around the boy's anus.

With the assistance of a physician, Nurse Megan Day inserted an anoscope into Larry's rectum, performed swabs from various body parts, and inspected anal tissue, but could not find a source of rectal bleeding. Larry cried in pain during the procedure. Nurse Megan Day delivered the physical evidence she collected to law enforcement.

On May 2, Kittitas County Sheriff's Detective Darren Higashiyama visited the hospital examination room, knelt on one knee beside Larry, and introduced himself. Without prompting, Larry remarked: "'I have something to tell you.'" RP at 344. Detective Higashiyama asked: "'[W]ell, what is that?'" The young boy responded: "'Cas put macaroni, lots of cream, and his pee pee in my butt.'" RP at 344.

3

On May 4, 2011, Ellensburg Police Detective Sergeant Brett Koss interviewed Larry Hart, at the police station, with the assistance of a social worker and victim's advocate. Sarah Hart joined them later in the interview to help calm Larry. Larry contradicted himself at times, but he mostly reiterated his earlier statements in response to open-ended questions. For example, when Sergeant Koss inquired: "'So, can you tell me what happened that made your butt hurt?'" Larry replied: "'Cas . . . put his pee pee in my butt.'" *State v. Volk*, No. 30707-7-III, slip op. at 4 (Wash. Ct. App. Feb. 4, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/307077.unp.pdf. Nevertheless, in moments of apparent confusion or coyness, Larry later equivocated on whether he told the truth or a lie.

During the police station interview and following Larry Hart's equivocations, his mother Sarah Hart intervened by directing Larry to "tell them what you told mommy. I'll give you a piece of gum. . . . Remember I said if you come down here and talk to people we'll go to the dollar store." Memorandum in Support of Petition for Relief from Personal Restraint (Memo), Appendix 3, Exhibit 11, at PV000586. The mother then, in the presence of Larry, recounted her memory of what her son earlier reported to her.

On May 11, 2011, Child Sexual Assault Forensic Interviewer Lisa Larrabee interviewed Larry in the presence of Sarah Hart. Larry again reiterated his prior statements in response to open-ended questions. For example, when Larrabee stated: "'Now I want to talk to you about why you came to talk to me today,'" Larry replied,

4

"'Cas hurt me. . . . He put his pee pee in my butt and stuck a whole lot of cream and put macaroni in my butt . . . . The cream first and then the macaroni and then his pee pee.'" *State v. Volk*, No. 30707-7-III, slip op. at 4 (alterations in original). Larrabee asked Larry: "'What did it feel like when [Cas] put his pee pee in your butt?'" *State v. Volk*, No. 30707-7-III, slip op. at 5 (alterations in original). The boy answered: "'Like, it felt, like, soft, like soft and warm. . . . Like, like, it was all the way in my butt.'" *State v. Volk*, No. 30707-7-III, slip op. at 5 (alterations in original). Larrabee asked Larry: "'And, and what was [Cas] doing with his feet and legs when his pee pee was in your butt?'" *State v. Volk*, No. 30707-7-III, slip op. at 5 (alterations in original). The youngster answered, "'He was going like this.'" *State v. Volk*, No. 30707-7-III, slip op. at 5. Larry demonstrated by gyrating his hips in a circular movement. Larry explained further, "'My hands were down on the ground. . . . 'Cause, 'cause I was bending over; I was in . . . a bed.'" *State v. Volk*, No. 30707-7-III, slip op. at 5 (alterations in original). Following these disclosures, Larrabee praised Larry by exclaiming: "'you know you just did a really good job.'" Memo, Appendix 3, Exhibit 6, at 5 (emphasis omitted).

Law enforcement forwarded evidence, including Larry's Black Ranger underwear, swabs of Larry's genitals and anus, and other underwear and diapers worn by the boy during his stay at Diedre Cleary's home, to the Washington State Patrol Crime Laboratory for testing. We do not know if the underwear is the same underwear that Larry wore on the date of the alleged rape. The laboratory found no sperm on any item.

5

The Black Ranger underwear tested positive for P-30, a genetic marker that typically indicates the presence of semen, the ejaculate fluid that surrounds sperm but does not itself contain any deoxyribonucleic acid (DNA) or sperm. Without the presence of sperm, semen's human source cannot be identified. A specimen of semen commonly includes sperm unless the man who produced the specimen is infertile or has had a vasectomy.

In May 2011, the State of Washington charged Casmer Volk with first degree child rape. The State also alleged the aggravating circumstance that Volk committed the crime knowing that Larry was vulnerable or incapable of resistance. After holding a competency hearing, the trial court ruled Larry Hart was not competent to testify.

During the first trial, the State's experts, including Megan Inslee, a forensic scientist with the Washington State Patrol, testified that she could not conclusively tie Casmer Volk to the semen on Larry's underwear, but she also could not exclude Volk as a source. The State contended that Volk must be the source of the semen as Larry, Larry's brother, and Diedre Cleary's male children were too young to produce sperm or semen and the only other possible source would be Thomas Hart, Larry's father. Since Thomas sired biological children and Volk fathered none, the State posited that Volk must maintain a low sperm count, with the conclusion that only Volk could be responsible for the semen without sperm found on the Black Ranger underwear.

At the conclusion of the first trial, the jury deadlocked. The trial court declared a

6

mistrial.

Prior to the second trial, Casmer Volk, having listened to the State's arguments during the first trial, performed research about P-30. He, in part, wished to refute the State's claim that P-30 indicates the presence of semen and absence of sperm. On November 1, 2011, Volk sent his trial counsel a link to an online article about P-30, which article read:

> No studies have been performed to assess the PSA [P-30] levels in the tissues and secretions of pre-pubescent children. Therefore, the presence of PSA from a high sensitivity (4 ng/mL) test cannot conclusively identify the presence of semen, so care must be taken with the interpretation of such results.

Ref. Hearing Ex. 115. During a later reference hearing, trial counsel acknowledged receipt of this link from Volk. Counsel then told Volk: "in the event we need to proceed to trial on this case we need to talk about retaining the services of some expert witness pertaining to the sperm situation." Ref. Hearing Ex. 118. Volk's counsel retained no expert, however.

Following the first trial, Casmer Volk wished to refute the State's argument that he was the likely contributor of the sperm-free semen. Volk produced a semen sample at a Sacred Heart Medical Center clinic. Sacred Heart physician William Dittman analyzed the sample for its sperm count and concluded Volk carried active sperm in normal quantity.

Before the second trial, the trial court conducted another competency hearing and

ruled that an older Larry was now competent to testify. After voir dire in the second trial, the State commented, outside the presence of the jury, that the defense could not gain admission as an exhibit of the sperm court report without the accompanying testimony of an expert. In response, defense counsel reserved the right to enter the report into evidence.

During the second trial, the State elicited the following testimony from Larry Hart:

Q. Why are you here today?
A. To tell the truth.
Q. To tell the truth about what, [Larry]?
A. About Cas.
Q. What about Cas?
A. Cas hurt me.
. . . .
Q. How did Cas hurt you?
A. He put cream in my butt. He put cream in my butt and his pee pee in my butt and macaroni in my butt.

RP at 42.

Other State witnesses included Thomas and Sarah Hart, Larry's sibling, Nurse Megan Day, Detective Darren Higashiyama, Detective Brett Koss, Lisa Larrabee, and the technicians at the Washington State Patrol Laboratory who conducted the tests on Larry's samples. The State also showed the jury videos of Larry's interviews respectively with Koss and Larrabee.

Lisa Larrabee testified to her interview with Larry Hart and the difficulties inherent in interviewing young children for details of an alleged crime. Larrabee

remarked that a child's fatigue, hunger, or desire for the interview to end may result in the child rendering inappropriate and implausible answers to questions posed. Larrabee opined, nonetheless, that, despite these impediments, a child can still impart credible information. Larrabee testified that a child's best answer, even one full of implausible details, "doesn't mean they're [sic] deliberately telling falsehoods." RP at 427.

The State also called Troy Swarthout as a witness during the second trial. Before posting bail, Casmer Volk reposed in the same jail pod as Swarthout, a convicted felon who had previously assisted Kittitas County law enforcement as a confidential informant. Swarthout testified that Volk and he conversed while in jail. He averred that Volk asked him if use of a condom prevents the depositing of DNA evidence. Swarthout further declared that Volk accused Larry's mother of being a "vindictive bitch." RP at 323.

Defense counsel called no witnesses other than Casmer Volk, who proclaimed his innocence. Volk testified that, while in jail, he called Sarah Hart a bitch and denounced her to Troy Swarthout for coercing Larry to falsely accuse him. He conceded he might have mentioned DNA, but denied mentioning, to Swarthout, a condom. Defense counsel asked Volk whether he held an opinion on whether he could produce sperm. After Volk responded affirmatively, his counsel asked him how he knew. Volk responded that he underwent a test. Following the State's objection, counsel asked Volk to reiterate his belief that he generated sperm. Defense counsel never referred to Dr. William Dittman's report or attempted to submit the report into evidence.

9

The jury found Casmer Volk guilty of first degree rape of a child and also found the presence of the aggravating circumstance of Larry's vulnerability. On the basis of this aggravator, the trial court imposed an exceptional sentence. The court sentenced Volk to a total of twenty-eight years' imprisonment, ten years above the standard range. The court never entered written findings articulating its reasons for the exceptional sentence. Volk appealed.

This court upheld Casmer Volk's conviction in *State v. Volk*, noted at 179 Wn. App. 1024 (2014), reversed some community custody conditions, remanded for revision of other conditions, and declined to remand to require entry of written findings for the exceptional sentence. Volk successfully petitioned the Washington Supreme Court for review of the trial court's failure to enter written findings of fact in support of its exceptional sentence. *State v. Volk*, 180 Wn.2d 1013, 327 P.3d 54 (2014). The Supreme Court remanded the case for entry of written findings of fact and conclusions of law. *State v. Friedlund*, 182 Wn.2d 388, 341 P.3d 280 (2015). On May 12, 2015, the trial court entered written findings supporting its exceptional sentence, while declining Volk's request to reconsider the length of the sentence.

PROCEDURE

Casmer Volk filed a personal restraint petition. He claimed his trial counsel breached his constitutional right to assistance of counsel because counsel failed to provide expert testimony and failed to submit, as an exhibit, the report of his normal

10

sperm count. As part of his petition submittal, Volk included a declaration of Dr. Greg Hampikian, who opined that his review of the Washington State Patrol Crime Laboratory's results make it unlikely the P-30 came from semen. The declaration observed that the P-30 was found high on the waistband of the Black Ranger underwear, a place semen would not naturally be found following a rape. Hampikian stated the P-30 may have come from another bodily fluid and transferred innocuously to Larry Hart's underwear.

In response to Casmer Volk's personal restraint petition, this court ordered a reference hearing. This court asked the trial court to entertain evidence for the purpose of gaining answers to the following questions:

> Did [trial counsel] consider using experts in his preparation for the first trial (why or why not), and (2) did Mr. Volk or his family make [trial counsel] aware of Dr. Dittman and/or other prospective witnesses prior to the second trial, and, if so, identify the proposed witnesses, the general nature of their expected testimony, and [trial counsel's] thought processes.

Order for Reference Hearing, *In re Personal Restraint of Volk*, No 34017-1-III (Wash. Ct. App. March 29, 2017).

During the reference hearing, Casmer Volk introduced documents from his trial counsel's file that showed consideration of the use of defense experts. In turn, counsel testified:

> I believed we would prevail based on—demonstrating that there was not proof beyond a reasonable doubt in the evidence that was going to be submitted by the prosecution and our response to it.

11

Reference Hearing Report of Proceedings (RHRP) at 81. Counsel summarized his

thoughts preceding the second trial:

> I [Trial counsel] thought under the circumstances, a hung jury from a
> tactical, procedural perspective, in light of what the state had presented and
> our defense and our explanation and the observation of the tapes of the
> young child and his recant of testimony, and changing a modifying testimony
> as—as well as the scope of the examination of the experts and my—
> consultation with several of the jurors who I reached by phone who indicated
> there was absence of scientific evidence, I was—or factors in their—their
> holding out for not guilty, I felt we were okay.
>
> [Casmer Volk's reference hearing counsel]: So your plan was to try
> the case the second way—excuse me—the second time the same way.
>
> [Trial counsel]: Yes.

RHRP at 81-82.

During the reference hearing, trial counsel denied an accusation that he refrained

from expert testimony solely because of the cost, though he agreed cost was a

consideration. Counsel admitted being unaware of *State v. Punsalan*, 156 Wn.2d 875,

133 P.3d 934 (2006), which permits payment of expert witnesses from public funds for

an indigent defendant represented by retained counsel.

During the second trial, Casmer Volk testified to the sperm testing that confirmed

his producing sperm, but no expert corroborated that testimony. Trial counsel, during the

reference hearing, testified that he deemed Volk's testimony sufficient to inform the jury

of Volk's production of sperm. Nevertheless, counsel conceded an expert could give

greater weight to the scientific data. Counsel reiterated that he adjudged expert testimony

as unnecessary for the second trial because of the poor quality of Larry Hart's testimony, although counsel admitted that Larry's testimony improved at the second trial due to his increased age.

During the comprehensive reference hearing, the trial court entertained testimony from Casmer Volk and his mother, Phyllis Volk. Both testified that he or she notified trial counsel of two experts before the second trial. DNA expert, William Dittman, would have testified that DNA did not identify Volk as the perpetrator. Remember the State's own expert stated that she could not confirm Volk as the perpetrator based on DNA evidence.

At the close of the reference hearing, Casmer Volk mentioned that trial counsel failed to order a transcript of the first trial for use as an impeachment tool at the second trial. Volk contended that trial counsel's file evidenced that, by the beginning of the second trial, counsel had assessed a need for expert testimony, but failed to act on this assessment. Volk argued that counsel performed with gross deficiency by his reliance on the first trial ending in a hung jury. Volk also emphasized that trial counsel omitted use of experts based on costs, despite public funds being available for payment of the costs.

After the reference hearing, the trial court entered thorough written findings of fact:

> 1. Did [trial counsel] consider using experts in his preparation for the first trial? Answer, [trial counsel's] memory is uncertain. He was, however, aware the State intended to present expert evidence. [Trial

13

counsel] believed the poor quality of the victim's testimony was to the advantage of Defendant Volk. Further, there was no DNA identification of Mr. Volk linking him to the crime. Thus, [trial counsel] believed it was not necessary to use any experts.

2. Did Mr. Volk or his family make [trial counsel] aware of Dr. William Dittman, Jr., and/or other prospective witnesses prior to the second trial? Answer, yes. The witnesses identified were Mr. Howard Coleman and Dr. Dittman. Dr. Dittman's proposed testimony would have been to establish Mr. Volk was capable of producing sperm. Mr. Coleman was a forensic DNA expert. [Trial counsel] states he suspected he thought about calling Mr. Coleman but did not. It was something he would have thought about in his preparation for trial. Mr. Coleman had been contacted by the Volk family approximately one week before the second trial.

3. [Trial counsel] was aware of the potential need for expert testimony regarding the discovery of semen on the child's clothing, the nature of the semen and the possible sources of the semen.

4. [Trial counsel] was aware that DNA testing did not identify Mr. Volk as a contributor of the semen.

5. [Trial counsel] testified the decision not to present at trial the scientific evidence made available to him pretrial by Mr. Volk (i.e., PSA/P30 analysis and testing regarding Mr. Volk's fertility) would not be hurtful to Mr. Volk's case. Dr. Dittman's proposed testimony would have been that Mr. Volk produced sperm. Mr. Volk testified at trial that he could produce sperm. [Trial counsel] admitted the challenge to Mr. Volk's testimony would have been more significant than the challenge to Dr. Dittman's testimony.

6. [Trial counsel] did not consult any expert on the issues regarding the source or presence of semen. [Trial counsel] could not recall his thinking about the need for an expert on the presence of semen.

7. [Trial counsel] testified money is always a factor in retaining an expert. To what extent money was a factor in his decision not to retain an expert is unclear. [Trial counsel] was unaware of the decision in State v. Punsalan, 156 Wn.2d 875 (2006), holding that public funds for experts are also available to those with private attorneys. To [trial counsel's] knowledge, the defendant owned part of a family business, as well as his own home. Both [trial counsel] and Mr. Volk testified that they had never discussed the defendant's finances. [Trial counsel] did no research factually or legally as to public or private funding of an expert in this case. Phyllis Volk, the defendant's mother, testified that she told [trial counsel] it

14

would be better to spend the money for an expert than later to regret not doing so.

8. [Trial counsel] does not recall today what discussions or thoughts he had regarding the consultation of an expert regarding whether the presence of PSA was also necessarily associated with the presence of semen.

9. Based on the absence of DNA in the first trial together with the testimony and tapes of the victim, [trial counsel] felt the hung jury from the first trial was an acceptable outcome although he hoped for an acquittal. Given the outcome of the first trial, his strategy for the second trial would be the same strategy as used in the first trial.

10. [Trial counsel] does not recall that he ordered transcription of any testimony in the first trial. He testified that he would have placed any such transcript in his file and that he did send petitioner's counsel, David Marshall, a complete copy of his file. Thus, he testified, the absence of any such transcript in the file received by Mr. Marshall likely means he ordered none.

Order Re Reference Hearing Re Personal Restraint Petition, *In re Personal Restraint Petition of Volk*, No. 11-1-00084-1 (Kittitas County Super. Court, Wash. June 23, 2017).

## LAW AND ANALYSIS

Casmer Volk contends that his trial counsel performed ineffectively and the ineffective assistance of counsel caused him prejudice. He requests that this court grant him a new trial. We agree with Volk and grant him a new trial. In light of the trial court's findings at the reference hearing and the affidavits supporting Volk's personal restraint petition, we conclude that counsel deficiently performed by failing to investigate and find relevant scientific evidence, by not consulting with forensic or medical experts in defense of Volk, and by omitting expert testimony. We adjudge such deficient performance as harmful to Volk.

15

To obtain relief on collateral review based on constitutional error, the petitioner must demonstrate by a preponderance of the evidence that he was actually and substantially prejudiced by an error. *In re Personal Restraint of Davis*, 152 Wn.2d 647, 671-72, 101 P.3d 1 (2004). If a personal restraint petitioner supports an ineffective assistance of counsel claim, he necessarily fulfills his burden to show actual and substantial prejudice. *In re Personal Restraint of Crace*, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012).

The Sixth Amendment to the United States Constitution guarantees an accused the right to legal counsel in criminal trials. Like the federal constitution, Washington's Constitution also grants an accused, in a criminal prosecution, the right to appear by counsel. WASH. CONST. art. I, § 22. The right to counsel under the state and federal constitutions are coextensive. *State v. Long*, 104 Wn.2d 285, 288, 705 P.2d 245 (1985).

The constitution guarantees the accused more than an attorney who sits next to him at counsel table. To meaningfully protect an accused's right to counsel, an accused is entitled to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The right to effective assistance of counsel is recognized not for its own sake, but for the effect it has on the ability of the accused to receive a fair trial. *State v. Webbe*, 122 Wn. App. 683, 694, 94 P.3d 994 (2004).

Courts apply a two pronged test to determine if counsel provided effective

16

assistance: (1) whether counsel performed deficiently, and (2) whether the deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. at 687. To satisfy the first prong of deficient performance, the accused must show that, after considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). The defendant carries the burden to show deficient performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011). This court gives great deference to trial counsel's performance and begins the analysis with a strong presumption counsel performed effectively. *State v. West*, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015).

In general, trial strategy and tactics cannot form the basis of a finding of deficient performance. *State v. Johnston*, 143 Wn. App. 1; 16, 177 P.3d 1127 (2007). A criminal defendant can rebut the presumption of reasonable performance by demonstrating that no conceivable legitimate tactic explains counsel's performance. *In re Personal Restraint of Caldellis*, 187 Wn.2d 127, 141, 385 P.3d 135 (2016); *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Not all defense counsel's strategies or tactics are immune from attack. *In re Personal Restraint of Caldellis*, 187 Wn.2d at 141. The relevant question is not whether counsel's choices were strategic, but whether they were reasonable. *Roe v. Flores-Ortega*, 528 U.S. 470, 481, 120 S. Ct. 1029, 145 L. Ed. 2d 985 (2000); *State v. Grier*, 171 Wn.2d at 34 (2011).

Courts cannot exhaustively define the obligations of counsel or form a checklist

17

for judicial evaluation of attorney performance. *Strickland v. Washington*, 466 U.S. at 688 (1984). Nevertheless, effective representation entails certain basic duties, such as the overarching duty to advocate the defendant's cause and the more particular duty to assert such skill and knowledge as will render the trial a reliable adversarial testing process. *Strickland v. Washington*, 466 U.S. at 688; *In re Personal Restraint of Yung-Cheng Tsai*, 183 Wn.2d 91, 100, 351 P.3d 138 (2015).

Casmer Volk argues that his trial counsel performed deficiently when failing to call Dr. William Dittman or some other expert as a witness or at least investige with an expert the critical subject of semen. Ordinarily, the decision whether to call a witness is a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel. *State v. Byrd*, 30 Wn. App. 794, 799, 638 P.2d 601 (1981). The presumption of counsel's competence can be overcome, however, by showing counsel failed to conduct appropriate investigations to determine what defenses were available, adequately prepare for trial, or subpoena necessary witnesses. *State v. Jury*, 19 Wn. App. 256, 263-64, 576 P.2d 1302 (1978).

We deem *State v. Maurice*, 79 Wn. App. 544, 903 P.2d 514 (1995) informative. The trial court convicted Gregory Maurice of vehicular homicide. As part of a personal restraint petition, Maurice submitted an affidavit from an accident reconstructionist that the car malfunctioned. Maurice contended that his attorney performed ineffectively by failing to investigate the vehicle's malfunction. This court remanded for a hearing to

18

determine the truth of the affidavit.

In *Eaddy v. State*, 845 So. 2d 961 (Fla. Dist. Ct. App. 2003), the reviewing court granted Anthony Eaddy post-conviction relief on the allegation that his counsel failed to hire a DNA expert to explain evidence. In *Byrd v. Trombley*, 580 F. Supp. 2d 542 (E.D. Mich. 2008), *aff'd*, 352 F. App'x 6 (6th Cir. 2009), the federal court granted the defendant habeas corpus relief on the ground that his defense counsel failed to investigate and present expert medical testimony that could have led to an acquittal on criminal sexual misconduct.

Casmer Volk's trial counsel failed to advance a reasonable defense strategy when he failed to speak in advance of trial with an expert witness about the nature of P-30 and about Volk's sperm count. Counsel failed to advance a reasonable strategy when he failed to call to testify an expert to confirm Volk's normal sperm count. The State emphasized to the jury that the presence of P-30 meant the presence of semen, and, in this instance, the semen lacked sperm. The State mentioned that Volk never fathered children and thus he was the only suspect for having semen in Larry's underwear. Any jury would question Volk's self-serving testimony that his semen sample contained sperm in normal amounts. A jury would wonder why, if Volk's testimony was true, the defense did not call a physician or other witness with a scientific background to confirm Volk's declaration. Trial counsel possessed a report as to Volk's sperm count, but counsel did not even attempt to admit the report as an exhibit.

19

In preparation for the second trial, Casmer Volk and his family forwarded information to trial counsel indicating P-30 could be found in bodily fluids other than semen. Counsel took no steps in response to this information and did not even question the State's expert about the information.

The first trial's ending in a hung jury did not excuse the failure of trial counsel. A hung jury meant that some jurors deemed Casmer Volk guilty. Scientific evidence could have persuaded such jurors otherwise. Defense counsel's engaging in the same tactics in the second trial that he employed in the first trial does not render counsel's conduct reasonable. Volk did not want a second hung jury. He desired an acquittal.

The dissenting opinion suggests that the State's expert witness supported Casmer Volk's defense. State expert, Megan Inslee, a forensic scientist with the Washington State Patrol, testified that she could not conclusively tie Casmer Volk to the semen on Larry's underwear, but she also could not exclude Volk as a source. William Dittman would have provided significantly stronger testimony favoring Volk.

The cost of the expert witness did not excuse trial counsel from soliciting the assistance of an expert. The State would have paid for the witness. Trial counsel unreasonably failed to know of a Washington decision that imposed the cost of an expert on the State when the defendant was indigent regardless of whether the defendant hired private counsel. In addition, Volk's family told trial counsel that family members would pay for the cost of an expert. In a declaration, trial counsel implied that he did not pursue

20

an expert because of unpaid legal bills.

In his personal restraint petition, Casmer Volk also contends that his trial counsel additionally performed deficiently by failing to consult with an expert in child memory and suggestibility. We do not address this argument, because we grant a new trial on other grounds.

To establish ineffective assistance of counsel, Casmer Volk must also establish that the ineffective assistance prejudiced him. Prejudice is established when there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *In re Personal Restraint of Brett*, 142 Wn.2d 868, 873, 16 P.3d 601 (2001). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland v. Washington*, 466 U.S. at 694 (1984); *In re Personal Restraint of Caldellis*, 187 Wn.2d at 141 (2016). If this court is convinced a petitioner has proved actual prejudicial error, the court should grant the personal restraint petition without remanding the cause for another hearing. *In re Personal Restraint of Hews*, 99 Wn.2d 80, 88, 660 P.2d 263 (1983). Because of the State's emphasis on the semen found on the underwear, because of the need for expert testimony to rebut the State's contention that the semen on the underwear belonged to Volk, and because of an earlier hung jury, our confidence in the outcome of the second trial is undermined.

21

CONCLUSION

We grant Casmer Volk's personal restraint petition. We remand for a new trial on the charge against Volk.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Fearing, C.J.

I CONCUR:

_____
Siddoway, J.

No. 34017-1-III

KORSMO, J. (dissenting) — Having a different, or even a better, way to try a case does not mean that trial counsel performed ineffectively at trial. Counsel achieved a hung jury in the first trial and could reasonably expect to do no worse at the retrial, thus making the decision to retry it in the same manner a valid tactic. Since Mr. Volk has not shown that anything was wrong with that approach, this personal restraint petition (PRP) necessarily fails.

In its seminal case on ineffective assistance of counsel, the United States Supreme Court noted:

> There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland v. Washington*, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Mr. Volk brought this PRP arguing, in essence, that his trial counsel did not further investigate and retry this case in a different manner by calling unnecessary experts. Volk needed to do more than that. He had to show that counsel's defense at the retrial was so significantly below professional standards that confidence in the verdict was undermined. *Id.*, at 694. He failed to make that showing here.

The defense did not need to call a DNA expert. The State's expert had already testified at the first trial that the only DNA recovered did not tie Volk to the crime. A redundant expert would not help the defense.[1]

The majority also contends that an expert to talk about PSA[2] would have been useful. Perhaps. Or perhaps not. The evidence called to trial counsel's attention simply pointed out that there were no studies concerning the ability of children the victim's age to produce PSA. It neither rejected nor supported the possibility, thus making such evidence unhelpful to the jury. The defense expert also would have confirmed that the PSA found on the waistband of the victim's underwear was transferred there. Again, that evidence is unilluminating since that both sides believed that to be the case. Further

---

[1] The majority also focuses on the irrelevant fact that defense counsel was unaware that the State might pay for experts at the retrial. This point is irrelevant due to the fact that defense counsel never rejected the experts due to cost. Counsel recognized that the marginal utility of the expert testimony did not justify the cost of calling the expert, but neither his testimony nor the court's reference hearing findings indicated that counsel rejected using experts because of expense to Mr. Volk. Nor did Mr. Volk argue that he was unable to pay for the experts—the majority even notes that Volk's family offered to pay for an expert. It also is unclear from the record of the appeal whether or not trial counsel was appointed or retained, although Mr. Volk was declared indigent for purposes of his appeal. Volk did not claim indigency in this action and paid the filing fee and has been represented by retained counsel. Finally, the State will only pay for experts whose testimony is "necessary to an adequate defense." CrR 3.1(f)(1); *State v. Kelly*, 102 Wn.2d 188, 200, 685 P.2d 564 (1984). These experts were not shown to be necessary to the defense. This issue is an irrelevancy.

[2] Prostate-specific antigen.

2

confirmation of that fact did not help the defense. One is left to wonder what use expert testimony about PSA would have been.

The majority also faults defense counsel for not ordering a verbatim report of the first trial, although neither the majority nor the defense explain how that fact was of consequence to the second trial.[3] Mr. Volk could easily point to a change in testimony if there was one. He has not.

Both Mr. Volk and the majority exaggerate the importance of the PSA/DNA testimony to the prosecution. In 24 pages of closing argument at the second trial, about three pages of the prosecutor's argument discusses the scientific evidence. *State v. Volk*, No. 30707-7-III Report of Proceedings (RP) at 650-652. Similarly, three pages of defense counsel's 24 page closing argument focus on the scientific evidence. *Id.* at 678-680. Defense counsel hammered how the forensic evidence supported finding his client not guilty, while the prosecutor struggled to explain that the evidence did not torpedo his case.

However, the bulk of the closing arguments were spent on other topics. The prosecutor focused on the victim's initial disclosure statement and the lack of credibility of the adult witnesses in the case. The defense likewise argued that the statement of the

---

[3] The clerk's papers (CP) from the direct appeal, file No. 30707-7-III, show that at least a partial verbatim report was prepared for the second trial. The emergency room physician's testimony from the first trial was introduced in written form for the second trial. CP at 107-120.

then-four-year-old victim was at odds with the physical evidence and that the defendant's large penis would have caused injury if the child's testimony was accurate. RP at 666-676. This was not a case of overemphasis on the scientific evidence by either party, but simply fairly typical arguments that the evidence either did or did not advance each party's case.

Defense counsel did a fine job in closing argument. He repeatedly distinguished his style from that of the prosecutor, which he very gently criticized as "flamboyant and bombastic," even referencing unnecessary "fire crackers and fireworks put on by the prosecutor in final statement." RP at 661, 664. Those observations are important because all this case boils down to is a difference in style. Mr. Volk thinks that his attorney should have more aggressively sought scientific evidence to challenge the prosecutor. However, there simply was no need. I imagine all members of this panel have tried cases in which counsel tried to convince a jury that the evidence meant more than it really did. Juries see through those types of arguments all the time, to the detriment of the overzealous attorney's client. That was counsel's approach here. The prosecutor tried to argue that the absence of DNA evidence did not ruin his case. In contrast, the defense pointed out that the prosecutor still bore the burden of proof and could not meet it under these circumstances despite the slide show used in closing

4

argument. He correctly argued that the prosecutor's argument about the evidence did not hold water. There simply was nothing wrong with the defense's trial of the case.[4]

Mr. Volk has successfully convinced the majority that his counsel failed to rebut an argument by the prosecutor that had failed to convince the jury the first time around. Might it have been better to have prepared differently for the retrial? Possibly. However, there simply was nothing wrong with trial counsel deciding that what had not worked for the prosecutor the first time was unlikely to work better the second time around. Mr. Volk needed to show that approach was erroneous. He has not done so.

The PRP should be dismissed.

Korsmo, J.

---

[4] A point also supported by the fact that the PRP does not allege prosecutorial misconduct as a basis for any relief.