IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 80077-9-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ERIC DIETZ EASTMAN, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | |

ANDRUS, A.C.J. — Eric Dietz Eastman challenges his convictions for one count of felony stalking and seven counts of felony violation of a no-contact order, arguing he received ineffective assistance of counsel. Because Eastman fails to demonstrate deficient performance and prejudice, we affirm.

## FACTS

Eastman and his former spouse, Annabelle Cotten, had a complicated and sometimes violent relationship. Eastman—despite an October 2015 conviction for harassing Cotten and two subsequent convictions for violating protection orders—claimed that he never stalked or threatened Cotten, that she was not afraid of him, and that she or her boyfriend had fabricated text messages purportedly sent by him. Eastman's counsel presented evidence at trial to support Eastman's version of events, which the jury did not credit.

The record below demonstrates the following: Eastman and Cotten married in 2001. They had four children—two sets of twins—together. The couple separated, and Cotten began a relationship with Russell Diedrich a few months before the divorce finalized in November 2015.

Cotten obtained a protection order for herself and her four children in October 2015. That same month, Eastman was convicted of harassing Cotten. The court then entered a no-contact order, effective November 9, 2015 to November 9, 2020. The order restrained Eastman from stalking Cotten and prohibited Eastman from contacting Cotten "directly, indirectly, in person or through others, by phone, mail, or electronic means." Eastman was subsequently convicted for violating this no-contact order on at least two occasions before April 2016.

For over a year thereafter, between April 20, 2016 and July 5, 2017, Eastman sent Cotten countless threatening text and Facebook messages. The State charged Eastman with one count of stalking[1] and seven counts of violating a no-contact order, each with domestic violence aggravators.[2] Eastman denied sending the threatening messages to Cotten and contended Cotten was not afraid of him.

---

[1] "A person commits the crime of stalking if . . . [h]e . . . intentionally and repeatedly harasses . . . another person; and . . . [t]he person being harassed . . . is placed in fear that the stalker intends to injure the person [or] another person . . . . The feeling of fear must be one that a reasonable person in the same situation would experience under all the circumstances; and . . . [t]he stalker either . . . [i]ntends to frighten, intimidate, or harass the person; or . . . [k]nows or reasonably should know that the person is afraid, intimidated, or harassed even if the stalker did not intend to place the person in fear or intimidate or harass the person." RCW 9A.46.110(1).

[2] The State also charged Eastman with one additional count each of stalking and violating a no-contact order. The trial court dismissed these additional counts at the close of the State's case-in-chief.

At trial, the State presented evidence that between April 20 and April 21, 2016, Eastman sent Cotten approximately 30 text messages. He wrote:

> I am going to show the judge your naked pics. Fuck you, slut. You're burnt. You're a whore and you know it. I'm going to torture your boy. Fuck you. You want war. Let's do this. I fuck banditos for fun. Tell your bitch it's on. I'm going to fuck your boy hard. Fuck you, cunt. It's on. I want war. I will destroy you. Tell your bitch I'm coming. Fuck you. Tell your bitch I'm coming. Fuck you. I hate you. I'm going to go crazy. Fuck you, slut. Your boy is a pile of ash in the street. Call the cops, cunt. I am going to destroy your boy toy. I promise. Fuck you slut. Total whore. You are just a slut. Die on it. Fuck you. Fuck you, slut. Just a sloppy cunt.

According to Cotten, "your bitch" and "your boy toy" referred to her boyfriend, Diedrich.

Cotten testified she recognized the phone number from which she received this string of messages as one Eastman had used to contact her for quite some time; she had had prior conversations with him using this number. Cotten and the officer who responded to her 911 call, Officer Nelson, called the phone number from which the text messages came, and they heard an outgoing message in a male's voice identifying himself as "Eric."

On September 7, 2016, Cotten reported she received additional messages from Eastman throughout the month of August 2016 and into early September 2016. The messages came from a different telephone number that Cotten recognized as a number Eastman had begun using to leave her voice mails. The text messages started with how much he loved Cotten and wanted to be with her and their children and how sorry he was for cheating on her. When Cotten did not respond, Eastman began accusing her of sleeping with other men, including "Russ."

- 3 -

When Cotten finally responded, she explained to Eastman how anxious he made her because "you are bipolar one minute your [sic] so nice and want to [be] cool, next your [sic] crazy mad and hate full [sic]." She told Eastman she felt safer knowing where he was. Her message to Eastman was consistent with her trial testimony. Cotten admitted, on cross-examination, she often tried to verify where Eastman was at any given time:

> I wanted to know where he was because I was always scared if he was in my window or if he was behind me or if he was going to be where I was or if he was going to come to my work or if he was going to be somewhere. I wanted to know where he was. I needed to know where he was.

In the August and September 2016 text message string, Eastman expressed anger at Cotten for her turning to a new boyfriend for comfort, instead of him. He told her he intended to get a new phone number the following day. This message was also consistent with Eastman's history of contacting Cotten in violation of the protection order. According to Cotten, whenever she blocked calls or text messages from him, he simply got a new number and began calling or texting her again.

In a subsequent string of texts, Eastman began to make threatening comments about coming to the house to "gut" and "eat" "a hells [sic] angel." He also threatened to cut her boyfriend's head off.

Then in July 2017, Eastman posted a rambling, profane, and vitriolic diatribe as comments to Cotten's Facebook profile picture. He wrote:

> Tell your bitch he's going to get fucked. Fuck you cunt. You're burnt. Promise you that. I was playing nice so I could see my kids. Now I'm pissed. Tell your bitch he's going to get raped. Whatever cop caller. Fuck you. When my kids are 18 and out of your life, I will

- 4 -

spoil them. Fuck you cunt. You are just a whore looking for a dick. Glad you found Russ. PS, no matter what, now, tomorrow, in the future, I'm going to find that fuck. I am going to hurt him. That's swear to god, patriot, Boy Scouts honor promise. That liberal fuck nigger will be dealt with. Swear to Christ. I'm kidding. Don't worry. I'm not going to hurt Russ. I love '80s steroid monkeys. Fuck you cunt. I'm going to hurt you. . . . Loves cock. Can't get enough. Choke on it cunt. Your boyfriend is fucking burnt. I promise you that. I'm done threatening. I'm drunk. But when I come to town to see my kids and your boy toy Russ is in my house, I'll shoot him. Just saying. Hurry. Call the cops you cunt. Cop calling cunt. You are a cunt -- you call the cops. You're a cunt calling cop bitch. I'm going to burn Russ in the street in 30 days because you want to fuck with me. You're a cunt. Choke on it cunt. Your boyfriend is fucking burnt. I promise you that. I'm going to hurt Russ. I promise. No matter what? I'm going to hurt Russ. I promise. You want to play? Let's play. I'm more powerful and I'm going to prove it. You told me you're more powerful. You're not. I'm going to hurt your man like bad. Daddy's coming home. I'm going to hurt your boy next week and that fat cop. Daddy's coming home.

The State also offered a video recording Cotten made of Eastman during a September 2014 altercation that led to his harassment conviction. Eastman sought to exclude the video under ER 404(b). The court denied this motion, concluding it was probative of Cotten's fear and the reasonableness of her fear, both elements of the stalking charge. In the video, Eastman can be seen and heard threatening Cotten that if she went "to war" with him, he would "gut you, bleed you, drag you, bury you, smoke over the top of your body and laugh at you." He warned Cotten that he would kill her parents and "save [her] 'til last [so she could] . . . watch everything." He repeated that he was going to show her pain she had never imagined. As defense counsel conceded during pretrial motions, the language Eastman used in the video was similar to the language used in the text messages and Facebook posts. According to Cotten, the video depicted her every-day life experience with Eastman.

Eastman challenged all of the State's evidence. For example, defense counsel presented evidence from a private investigator who testified that one of the several phone numbers from which Cotten received the text messages was not registered to Eastman. Counsel also called a computer and cell phone forensic expert, Randall Karstetter, who testified that phone numbers, text messages, and Facebook posts can be "spoofed." Karstetter explained that he can download an application that masks his phone number, thereby allowing him to send messages so that the messages appear to come from a phone number that is not his. He also testified that Facebook accounts can be easily faked.

In addition, defense counsel called Eastman's father, Stuart, to testify about his observations of Eastman and Cotten over the course of their lengthy relationship. He testified that he did not believe Cotten was afraid of Eastman and that she admitted having visited Eastman in jail after his arrest because she missed him. Counsel also elicited evidence from Cotten on cross-examination that in September 2016, after Eastman allegedly sent her the threatening messages, she nevertheless agreed to meet him and some contractors at a restaurant in Redmond to discuss a possible construction job on a commercial building project. And Cotten admitted she had visited Eastman in jail after his most recent arrest not once, but on three separate occasions. During one of those visits, she admitted she told Eastman that Diedrich had assaulted her and put a gun to her head in front of the children. She also admitted that, at Eastman's request, she contacted one of Eastman's adult children from another relationship to see if he could help bail Eastman out of jail.

As to the tumultuous history of their relationship, defense counsel elicited evidence that Cotten had been arrested for assaulting Eastman in the past and that she was convicted of disorderly conduct in Utah after hitting a drink out of Eastman's hand. She conceded Eastman had previously obtained a protection order against her. Despite the prohibition on her contacting Eastman, she admitted she did so regularly. In addition, counsel elicited evidence that Cotten used the 2014 video to obtain a protection order against Eastman during their subsequent divorce. Cotten also admitted that after Eastman moved to Utah, she created a fake Facebook account in the name of Stella Jenner and contacted Eastman using this alias to find out where he was. Stuart Eastman testified that his son and Cotten had always had a "rocky marriage," exchanged epithets, and argued, but they always got back together.

In closing, defense counsel argued that both Eastman and Cotten had obtained protection orders against the other and had used them to gain an advantage over the other in the divorce because of the children. Counsel contended no one had sought to confirm that any of the originating phone numbers belonged to Eastman. And counsel argued there was no credible evidence that Cotten actually feared Eastman: she continued to help him find construction jobs even after allegedly receiving the threatening texts, she visited him in jail and tried to help bail him out, and she sought his help when she felt threatened by an abusive boyfriend. Counsel also suggested that if Diedrich had pulled a gun on Cotten, as she admitted had occurred, then it was quite possible that Diedrich had

a motive to spoof the threatening text messages to Cotten as a way of keeping her away from Eastman.

The jury convicted Eastman as charged. The court sentenced Eastman to 96 months' confinement with 12 months community custody. Eastman appeals.

ANALYSIS

Eastman argues his trial counsel's legal representation was deficient because the defense theories were unsupported by the evidence and opened the door to extremely prejudicial evidence of Eastman's past history of physically abusing Cotten. The record does not support this argument.

Eastman's defense counsel faced significant inculpatory evidence. Counsel reasonably chose a logical defense: to defeat the stalking charge, he sought to demonstrate that both Eastman and Cotten were manipulative, but not truly afraid, of the other. And as for the no-contact order violations, he attempted to raise reasonable doubt that the text messages or Facebook posts originated from Eastman, suggesting instead that they were the work of Cotten herself or her physically abusive boyfriend. These theories had some factual support.

"The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington Constitution guarantee the right to effective assistance of counsel." State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). "When courts analyze claims of ineffective assistance of counsel, '[t]here is a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment in all significant decisions made.'" State v. Garrett, 124 Wn.2d 504, 520, 881 P.2d 185 (1994) (alteration in original) (quoting

Butcher v. Marquez, 758 F.2d 373, 376 (9th Cir. 1985)). "Ineffective assistance of counsel is a fact-based determination that is 'generally not amenable to per se rules.'" Grier, 171 Wn.2d at 34 (quoting State v. Cienfuegos, 144 Wn.2d 222, 229, 25 P.3d 1011 (2001)). "[T]he ultimate focus of [the] inquiry must be on the fundamental fairness of the proceeding whose result is being challenged." Strickland v. Washington, 466 U.S. 668, 696, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

Washington courts follow the Strickland two-pronged inquiry for determining whether assistance is ineffective. Grier, 171 Wn.2d at 32. Under that standard, Eastman must show not only that counsel's performance was deficient but also that the deficient performance prejudiced him. Id. at 32-33. Furthermore, we must evaluate counsel's performance by considering counsel's conduct from that attorney's perspective at the time of trial, making every effort "to eliminate the distorting effects of hindsight." Strickland, 466 U.S. at 689.

"[P]erformance is deficient if it falls 'below an objective standard of reasonableness.'" Grier, 171 Wn.2d at 33 (quoting Strickland, 466 U.S. at 688). We afford great deference to defense counsel regarding decisions made in the course of representation. Id. Accordingly, Eastman bears the burden to rebut the "strong presumption that counsel's performance was reasonable." Id. (internal quotation marks omitted) (quoting State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009)). Performance is not deficient when "counsel's conduct can be characterized as legitimate trial strategy or tactics." Id. (internal quotation marks omitted) (quoting Kyllo, 166 Wn.2d at 863); see also State v. Reichenbach, 153

Wn.2d 126, 130, 101 P.3d 80 (2004) (performance is reasonable if there is any "conceivable legitimate tactic explaining counsel's performance").

Eastman argues his counsel was ineffective because he went to trial with "an elaborate defense theory" that he was unprepared to support factually. Showing a failure to investigate available defenses or to adequately prepare for trial can overcome the presumption of reasonable performance. State v. Thomas, 109 Wn.2d 222, 230, 743 P.2d 816 (1987); see also State v. Maurice, 79 Wn. App. 544, 552, 903 P.2d 514 (1995). An unsuccessful defense, however, does not constitute ineffective assistance. Strickland, 466 U.S. at 690; see also Thomas, 109 Wn.2d at 228-29. Eastman has not shown that his counsel failed to adequately prepare for trial or that the defense theories were unsupported factually.

The record shows that counsel pursued reasonable defense theories, given the overwhelmingly inculpatory evidence. For example, counsel argued that Cotten or Diedrich may have spoofed the threatening text and Facebook messages so it would appear as though Eastman sent them. This theory had some factual support. None of the police officers to whom Cotten made reports took any steps to investigate the owner of the phone numbers from which the text messages or Facebook posts originated. Although Officer Nelson called one number and heard a man's voice identifying himself as "Eric" on the recording, he was unfamiliar with Eastman's voice and could not identify the voice on the phone as belonging to Eastman. The State conceded in its closing argument that "law enforcement probably could have done a better investigation."

In addition, defense counsel called Karstetter, a cell phone forensic expert, who testified that it was easy to spoof a phone number and send text messages that appeared to come from someone else. He also testified to the ease with which it is possible to fabricate a Facebook account and send messages to another under someone else's name. Defense counsel elicited an admission from Cotten that she knew how to create a fake Facebook account because she had contacted Eastman using an alias and a fake account.

And defense counsel developed evidence of a physically abusive relationship between Cotten and Diedrich to demonstrate motive for fabricating evidence against Eastman. Cotten testified she and Diedrich began living together in August 2015, while she was seeking a divorce from Eastman. Corporal Wells confirmed he had responded to a disturbance at the house between Diedrich and Cotten. Cotten confirmed her children had called 911 because Diedrich was yelling at her. And while living with Diedrich, and purportedly being harassed by Eastman, Cotten still allowed Eastman to use her name on his business license, and she met with Eastman and potential contractors to help Eastman get a construction job. Cotten admitted telling Eastman that Diedrich had pulled a gun on her in front of her children. This evidence allowed defense counsel to argue that Cotten could have authored the offensive, threatening text messages and Facebook posts as a way of maintaining contact with Eastman or that Diedrich could have done so as a way of eliminating his competition.

On the stalking charge, defense counsel argued Cotten did not fear Eastman. This theory was also supported by evidence. He elicited evidence from

Cotten that she continued to see Eastman, even after he purportedly sent the threatening texts, and she initiated contact with him after his arrest by visiting him in jail and asking for his protection from Diedrich. Cotten admitted she went to see Eastman when he was in jail and explored options to bail him out. Stuart Eastman testified that Cotten did not fear his son and told him she went to visit Eastman in jail because she missed him.

Defense counsel also sought to challenge Cotten's credibility by developing evidence that she was often the aggressor in the relationship with Eastman, asking Cotten if she had deliberately provoked the tirade she caught on the 2014 video to use as evidence in the divorce. On cross-examination, Eastman's counsel suggested Cotten took the video after Eastman told her he was filing for a divorce because she needed evidence to pursue a protection order against him. Cotten denied that Eastman made any such statement to her and reiterated the video depicted her every-day life while married to Eastman. Cotten indicated she had other videos depicting similar exchanges, but when asked where they were, she ambiguously replied those videos were on other phones.

Eastman argues on appeal that defense counsel's performance was deficient because he asked Cotten if she had ever assaulted Eastman, thereby opening the door to highly prejudicial rebuttal evidence as to the details of this "assault." In response to defense counsel's question, Cotten admitted she had assaulted Eastman in the past, but only in self-defense. On redirect, the State asked Cotten for details. Cotten testified Eastman choked her, pulled her by her hair, and dragged her:

> He was choking me. And I got away from him. He came back. I
> punched him in the face. And he started laughing at me because his
> nose started bleeding. He got me down on the ground, and he put
> his knees on my shoulders. And he opened my mouth and he made
> his nose bleed until my mouth filled up with blood and I was choking.

(Emphasis added.) Defense counsel objected to the testimony, but the court concluded counsel had opened the door to the details of the assault through his cross-examination. The court agreed to strike the last sentence of Cotten's testimony as overly prejudicial under ER 403, instructing the jury to disregard everything after "he then got her on the ground."

Had defense counsel not asked Cotten about a prior assault of Eastman, Cotten's testimony regarding the details of the physical altercation may not have been elicited. But the fact that damaging evidence was admitted on redirect because defense counsel opened the door to that evidence does not establish constitutionally deficient performance.

To prove the crime of stalking, the State had to prove that Eastman had intentionally and repeatedly harassed Cotten and that Cotten was "placed in fear that the stalker intend[ed] to injure" her or another person. RCW 9A.46.110(1). It also had to prove that Cotten's fear was reasonable. RCW 9A.46.110(1)(b). The central defense to the stalking charge was that Cotten's behavior over the years demonstrated she was not afraid of Eastman.

In this case, defense counsel became aware of an altercation between Cotten and Eastman during which Cotten was arrested for assault and for which she pleaded guilty to disorderly conduct. But the record also indicates counsel and an investigator interviewed Cotten before trial, and she revealed prior

altercations where Eastman had held her down, pulled her hair, and choked her. She described an incident when the children called 911 because Eastman was choking her. She stated that when the police arrived, he removed his prosthetic leg,[3] fell to the ground, and lied to the police, claiming she had pushed him. The police then arrested her instead of Eastman. So counsel was aware that there were incidents in the couple's past during which Cotten allegedly assaulted Eastman but Cotten claimed she did so only to protect herself from Eastman's abuse or Cotten claimed Eastman lied about who assaulted whom.

Deciding whether to elicit exculpatory evidence and, by doing so, potentially opening the door to prejudicial rebuttal evidence is often a difficult decision for defense counsel to make. Under section 4-5.2(d) of the ABA Standards for the Defense Function, how to conduct cross-examination of any witness is a strategic decision:

> Strategic and tactical decisions should be made by defense counsel, after consultation with the client where feasible and appropriate. Such decisions include how to pursue plea negotiations, how to craft and respond to motions and, at hearing or trial, what witnesses to call, <u>whether and how to conduct cross-examination</u>, what jurors to accept or strike, what motions and objections should be made, what stipulations if any to agree to, and what and how evidence should be introduced.[4]

(Emphasis added.) And section 4-7.6(a), entitled "Presentation of Evidence" provides:

> Defense counsel has no obligation to present evidence, and should always consider, in consultation with the client, whether a decision

---

[3] Eastman and Cotten were in a motorcycle accident in 2013. Cotten was hospitalized for extensive injuries, and Eastman lost his leg.

[4] AMERICAN BAR ASSOCIATION, Criminal Justice Standards for the Defense Function (4th ed. 2017), https://www.americanbar.org/groups/criminal_justice/standards/DefenseFunctionFourthEdition/.

> not to present evidence may be in the client's best interest.  In making this decision, <u>defense counsel should consider the impact of any evidence the defense would present and the potential damage that prosecution cross-examination or a rebuttal case could do, as well as the quality of the prosecution's evidence.</u>[5]

(Emphasis added.)

Given the overall strength of the State's case here, a reasonable defense attorney might conclude eliciting evidence of Cotten assaulting Eastman—to demonstrate she did not fear him—was worth the risk that the State might elicit damaging details of the altercation on rebuttal.  In hindsight, one can argue that the risk was too significant to take.  But "[h]indsight has no place in an ineffective assistance analysis." <u>Grier</u>, 171 Wn.2d at 43.  There is no evidence that defense counsel did not consider the impact of the prior assault evidence and weigh it against the potential damage that the prosecution's cross-examination or a rebuttal case could do.[6]

In addition, the strategy appears to be consistent with Eastman's own perceptions of events.  Although he did not testify at trial, Eastman maintained at his sentencing hearing that he never stalked Cotten.  He insisted she had been unfaithful to him on many occasions.[7]  According to Eastman, shortly before the

---

[5] <u>Id.</u>

[6] Eastman argues that counsel was "obviously unaware" of the prior bad acts his questions elicited. We cannot, on this record, reach this conclusion.  Cotten's pretrial interview certainly provided a significant amount of details regarding several physical altercations she experienced, including incidents in which Eastman claimed to have been the victim, not the aggressor.

[7] Eastman argues his defense counsel "developed an elaborate defense theory—involving a history of violence and infidelity by Ms. Cotten and a conspiracy between Ms. Cotten, Mr. Diedrich, and Corporal [Chad] Wells to frame Mr. Eastman—and then presented it to the jury without any of the evidence necessary to sustain it."  But the record does not support this contention.  While defense counsel sought to show Corporal Wells' bias by eliciting testimony from Cotten that Corporal Wells and a victim's advocate "collaborated" with her as to how to leave Eastman, and asking Corporal Wells if Cotten had tried to speak to him when he was off duty, defense counsel never suggested

2014 video was taken, Cotten spent eight months living with a man she met at work. Eastman believed Cotten manufactured the video to make getting a divorce easier. He also said he had never hurt Cotten and so she had no reason to fear him.

Given the consistency between Eastman's version of events and defense counsel's theory at trial, we assume the decisions to pursue certain lines of inquiry were based on information Eastman himself supplied. The United States Supreme Court instructed in Strickland:

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

466 U.S. at 691 (emphasis added). The record strongly suggests that defense counsel decided to pursue lines of inquiry based on facts supplied by his client. And we have no evidence that any further investigation would have disclosed exculpatory evidence or would not have revealed additional inculpatory evidence.

Eastman argues his case is analogous to Thomas. We disagree. In that case, counsel presented a diminished capacity defense based on voluntary

---

at trial that there was a sexual relationship between Corporal Wells and Cotten. Nor did he ever suggest Corporal Wells was involved in some conspiracy to fabricate evidence.

intoxication and called an unqualified "expert" witness to opine on Thomas's capacity to form intent. Thomas, 109 Wn.2d at 226, 229-30. Because the witness lacked the required qualifications, the trial court excluded her testimony, and defense counsel called no other expert witness. Id. at 229. Our Supreme Court found counsel's performance deficient because counsel completely failed to investigate the defense expert witness's qualifications, concluding that some minimum investigation into qualification is required. Id. at 230-31; cf. State v. Visitacion, 55 Wn. App. 166, 173-74, 776 P.2d 986 (1989) (finding counsel's performance deficient because counsel rejected witnesses proposed by defendant based solely on their police statements, without making any effort to contact or interview them).

Here, Eastman's counsel conducted more than the minimum investigation into the facts of this case. He and an investigator interviewed Officer Alex Michael, the police officer who responded to Cotten's 911 call in September 2016; Corporal Chad Wells, the officer who responded to Cotten's March 2017 911 call; and Cotten herself. Counsel's investigator researched a database of telephone numbers to determine if Eastman owned any of the numbers used to send Cotten text messages. And counsel retained Karstetter, a cell phone forensic expert, to develop opinions on the adequacy of the police investigation and the ease by which the messages Cotten claimed she received from Eastman could have been fabricated. Counsel also interviewed Eastman's father who testified about his first-hand knowledge of Cotten's lack of fear of her former spouse and her inconsistent

explanation for visiting him in the jail. This case is simply not analogous to Thomas.

Based on the record before this court, we cannot conclude that the strategic decisions defense counsel made were so devoid of merit as to constitute unreasonable and, therefore, deficient performance.

Nevertheless, Eastman argues that had defense counsel chosen not to ask Cotten about her assault of Eastman, the outcome would have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Strickland, 466 U.S. at 691. To satisfy Strickland's prejudice prong, Eastman "must establish that 'there is a reasonable probability that, but for counsel's deficient performance, the outcome of the proceedings would have been different.'" Grier, 171 Wn.2d at 34 (quoting Kyllo, 166 Wn.2d at 862). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 694). Counsel can be "confusing," "unprofessional," and "not highly competent," but when reviewed in the context of the entire trial, counsel's unprofessional acts may not rise to the level of depriving a defendant of a fair trial. Garrett, 124 Wn.2d at 521 (quoting United States v. Altamirano, 633 F.2d 147, 153 (9th Cir. 1980)). In assessing prejudice, we presume the "jury acted according to the law." Grier, 171 Wn.2d at 34 (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 694).

Eastman argues there is a reasonable probability the stalking verdict would have been different without Cotten's testimony describing Eastman's prior physical abuse. But this argument assumes the jury considered Cotten's testimony about Eastman's reaction when she punched him and caused his nose to bleed. The court struck that testimony, instructing the jury to disregard everything Cotten said after she stated that Eastman pinned her to the ground. Because juries are presumed to follow trial courts' instructions, State v. Lough, 125 Wn.2d 847, 864, 889 P.2d 487 (1995), we conclude the jurors did not consider Cotten's stricken testimony.

Eastman's argument also overlooks the powerful stalking evidence the State presented. The text messages and Facebook posts themselves are offensive to anyone who has to read them. But the video, in which Eastman is heard telling Cotten he would kill her family in front of her before making her bleed and causing her pain she had never imagined, would make any reasonable person fear for her life and the lives of her family members. As defense counsel admitted in pretrial hearings, "the text messages and the Facebook [posts] are inflammatory enough. But the video is something that takes it to a different level."

Cotten testified that when she received Eastman's threats, she became scared, could not breathe, and experienced panic attacks. She was scared because she "knew he was coming to get" her. Cotten testified the Facebook message terrified her because "I knew he was coming. I just—I knew he was coming to get me." She feared that he would kill her and her parents.

Additionally, Officer Nelson testified Cotten was "visibly shaken," when discussing the April 2016 messages from Eastman. He thought she looked upset based on "the way her muscles were contracting when she talked to me." Officer Michaels testified Cotten appeared "terrified" when he spoke to her about Eastman in September of that year. "She was constantly looking out the front windows. She was hiding her face. Seemed to be kind of cowering and paranoid. Not paranoid I guess so much as just worried and overwhelmed." And Corporal Wells detailed how Cotten planned her interactions with Eastman to minimize the probability that he would react violently. He testified:

> I believe [Cotten] is terrorized by this guy. And if she just stonewalls him, then it gets worse. So what she told me is that she feeds [him] a little bit of information in trying to keep him appeased so that the threats don't get worse, exacerbate, or he actually follows through with his threats to kill her.

There was overwhelming evidence that Cotten feared for her life and the lives of her family members and that her fear was reasonable. Eastman's arguments to the contrary are not persuasive.

Finally, we reject Eastman's argument that counsel's performance was so deficient throughout trial as to be presumptively prejudicial. "Under Strickland, we do not presume prejudice unless the trial 'loses its character as a confrontation between adversaries,' as when there is (1) a complete denial of the assistance of counsel, (2) the State's interference with counsel's assistance, or (3) an actual conflict of interest." State v. Carson, 184 Wn.2d 207, 226, 357 P.3d 1064 (2015) (quoting State v. Webbe, 122 Wn. App. 683, 694-95, 94 P.3d 994 (2004)). None of these circumstances were present here. Eastman's counsel actively

participated in all portions of trial. The State did not interfere with counsel's assistance, and no conflict of interest existed. Thus, we do not presume prejudice.

Because Eastman has failed to establish the trial's outcome would have been different had defense counsel not opened the door to Cotten's testimony regarding Eastman's past abuse of her, he has failed to show prejudice. Accordingly, we reject Eastman's ineffective assistance of counsel claim.

Affirmed.

_Andrus, A.C.J._

WE CONCUR: